UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

In re:

| | |
|---|---|
| HARRY J. DEERWESTER and<br>SHARON A. DEERWESTER | Case No. 9:08-bk-04363-ALP<br>Chapter 7 Case |

     Debtor(s)     /

ITASCA BANK AND TRUST.
    PLAINTIFF,

vs                                        Adv. Pro. No. 9:08-ap-00420-ALP

HARRY J. DEERWESTER a/k/a
H. JAY DEERWESTER, III and
SHARON A. DEERWESTER,

     DEFENDANT.     /

**FINDINGS OF FACT, CONCLUSION OF LAW
AND MEMORANDUM OPINION**

THE MATTER under consideration in the above referenced adversary proceeding is a two count Complaint filed by Itasca Bank and Trust (the "Bank"), against Harry J. Deerwester a/k/a H. Jay Deerwester, III (hereinafter, Deerwester/Debtor) and Sharon A. Deerwester (hereinafter, Mrs. Deerwester)(the "Debtors"). In the Complaint, the Bank is seeking denial of the Debtors' discharge pursuant to Section 727 of the Bankruptcy Code. The Bank in Count I of its Complaint asserts that there were numerous instances whereby the Debtors either provided

inaccurate information or failed to disclose information in connection with their bankruptcy case and, therefore, they have made "false oath" in violation of Section 727(a)(4)(A). The Bank in Count II of its Complaint seeks denial of discharge as to Debtor, Harry J. Deerwester, pursuant to 727(a)(2)(A) of the Bankruptcy Code, because the Debtor transferred his interest in GSM Properties of Southwest Florida, Inc ("GSM") within one year of filling his bankruptcy with the intent to hinder, delay or defraud creditors. It should be noted at the outset that the Plaintiff elects to abandon the claims relating to Paragraph 6(h) of the Complaint and Paragraph 9, but otherwise asserts that the evidence presented satisfies the requirements to deny the Debtors' discharge under the remaining claims set forth in Count I.

In response, the Debtors in their Answer admitted to certain admissions and denied certain general allegations set forth by the Plaintiff in their Complaint and seek a demand for judgment against the Plaintiff dismissing the Complaint with Prejudice, attorneys' fees and cost. In addition, the Debtors also asserted three affirmative defenses. Affirmative defenses in federal practice are governed by Fed.R.Civ.P. 8(c), as adopted by Fed.R.Bankr.P.9008(c). Since none of the affirmative defenses raised by the Defendants qualify under these rules, they will not be considered by this Court.

The facts relevant to the issues raised by the Bank as established at the final evidentiary hearing are as follows:

Prior to moving from Illinois to Florida in the year 2002, Deerwester's business experience included approximately 30 years in the graphite machining business including owning his own business and operating other businesses where revenues ran from $1.2 million per year, and as high as $4.5 million per year. [Transcript pp. 75-78]. Deerwester was

also involved in automobile sales, boat sales and the ownership of a marina in Illinois [Transcript p. 78:2-6].

It appears by 2004, the Debtors were in litigation with the Bank in the Circuit Court of the 18th Judicial Circuit, DuPage County, Illinois, in the case captioned *Itasca Bank v. Graphite Sales & Machining, Inc., H. Jay Deerwester, III and Sharon Deerwester*, Case No.: 2004 L 119. [Transcript p. 78:19-25]. The litigation was resolved in February, 2007, by entry of an agreed judgment against the Debtors and in favor of the Bank for $475,000.00 [Transcript p. 79:5-12]; see also Exhibit A to Plaintiff's Complaint. On February 22, 2007, the Bank domesticated the Illinois judgment in Lee County, Florida, on November 13, 2007. It appears that after the Bank domesticated the judgment in Lee County, Florida, the Bank contacted Deerwester concerning his intentions to repay the judgment. In response to the Bank's request, the Debtor attempted to negotiate a settlement with the Bank. However, settlement discussions broke down thereafter and Deerwester was under the impression that the Bank was about to begin efforts to execute on its judgment. [Transcript pp. 90:2-7;91:1-7].

On January 10, 2008, the Debtors met with Greg Champeau of the Law Offices of Miller & Hollander (the "Law Firm"). [Transcript p. 80:23-24; see also Plaintiff's Exh. 1]. A subsequent meeting occurred between Deerwester and attorney, Richard Hollander, on February 12, 2008. [Transcript pp. 82:9-12; 85:10-12; see also Plaintiff's Exh. 2]. At the February 12, 2008, meeting at the Law Firm, Deerwester began providing information to Mr. Hollander for inclusion in a document entitled "Questionnaire for Bankruptcy Filing" (the "Questionnaire"; Plaintiff's Exhibits 4 and 5). [Transcript pp. 83:15-25; 84:1-2,19-25; 85:1-8]. Deerwester was also provided with a document at the February 12, 2008, meeting entitled

"Information About Bankruptcy" which he acknowledges having read and signed. [Transcript p. 83:5-14; see also Plaintiff's Exh. 3].

After the February 12, 2008, meeting, Deerwester took home a copy of the Questionnaire to review with Mrs. Deerwester and both of them made notations on the Questionnaire. [Transcript pp. 85:13-25; 86-87]. The original Questionnaire was signed by Deerwester on page 16 of Exhibit 4 and on page 4 of Exhibit 5 [Transcript p. 88:3-10]. As of February 12, 2008, Deerweester did not believe there was any urgency with regard to filing bankruptcy as settlement negotiations were ongoing. [Transcript p. 89:12-15].

Prior to filing their Petition for Relief, the Debtors informed the Law Office that there were various errors on the Debtors' bankruptcy papers that needed to be corrected. Some of these mistakes were pointed out by the Debtors to their counsel prior to filing, but not all were corrected prior to the Law Firm filing the Debtors' Voluntary Petition for Relief. Nevertheless, the Debtor, who was a sophisticated business owner, knowingly signed "under penalty of perjury" the correctness of the Statements included in the submissions. The Law Firm filed the Debtors' Voluntary Petition for Relief pursuant to Chapter 7 of the Bankruptcy Code on March 31, 2008.

In due course the Bank filed the Complaint alleging a violation of Section 727(a)(4)(A) due to the debtors having made numerous false oaths by providing inaccurate information and by failing to disclose certain information as outlined below:

    a)    Failing to accurately value GSM Properties of Southwest Florida, Inc. ("GSM Properties") of which Harry J. Deerwester is 45% owner;

    b)    Failing to disclose that within one year prior to the filing of the petition, Harry J. Deerwester transferred majority control in GSM Properties to Floyd Sohn;

c)   As to the September 2006 transfer of certain real estate property to Whitewater Properties of Southwest Florida, Inc. ("Whitewater"), Debtors stated "not related" with regard to this entity when in fact, Whitewater is owned by the Debtors' two sons, Jayson Deerwester and Jayme Deerwester;

d)   Listing SunTrust Bank as second mortgagee on their homestead for $150,000.00 when, in fact, SunTrust has no mortgage interest in the Debtors' homestead;

e)   By providing a grossly inaccurate amount with regard to the debt owed to Frey Motors Inc. ("Frey") which Debtors listed has having a secured claim for $50,000.00 when, in fact, the Proof of Claim filed by Frey establishes a claim for only for $15,843.26;

f)   By providing an inaccurate amount with regard to the debt owed to A&C Medical, P.A. ("A&C") which Debtors listed as having a secured claim for $75,000 when, in fact, the Proof of Claim filed by A&C establishes a claim for only for $61,186.98;

g)   By failing to disclose that during the 90 days preceding the filing of the petition, the Debtors paid over $10,000.00 to American Express;

h)   Inaccurately stating that Classic Cars of Florida, LLC ("Classic Cars") owes Harry J. Deerwester $20,000.00 when, the total amount owed to Mr. Deerwester is $15,698.45; and

i)   Stating on Schedule B of their Schedules that their living revocable trust has "*no res*" and valuing the trust at $1 when, in fact, as of the Petition Date the Trust held title to an Ameritrade account valued at or about $39,000.00;

At the commencement of the proceeding the Bank announced that it no longer desired to pursue the allegations set forth in paragraphs 6(h) and 9(a) and (b) of the Complaint.

The record reveals that the Debtor's statement valuing his interest in the Living Revocable Trust was grossly undervalued at $1. The evidence at trial established that the Living Revocable Trust actually owned an Ameritrade account with a value in excess of $39,000 as of the date the Debtors filed their Petition for Relief.

The Trustee ultimately agreed on a valuation of $7,000 or $8,000 for the Debtors' interest in GSM Properties, Inc., "based on the hard assets and the cash on hand in the bank accounts as of the date of filing...." [Transcript pp. 11:16-25]. The balance of the allegations asserted by the Bank relate to the misstatements on the Debtors' Schedule D concerning their liabilities to certain creditors. The Court notes that it is not unusual that debtors incorrectly state the balance owed to creditors on the date of the commencement of their case. Stating an incorrect balance can hardly be the basis to deny a debtor's discharge, that is, unless it is shown that the incorrect statements are done for the purpose of indicating no equity in certain properties which are encumbered by the debt. There is nothing in this record that warrants the finding that these incorrect statements by the Debtors were done for improper purposes. However, this Court notes that inaccurate answers to questions in the Statement of Financial Affairs may be significant, and will be considered to conclude whether or not a debtor's discharge should be denied.

In the present instance, the Debtors' answer to Question 10 on the Statement of Financial Affairs, was inaccurate or incomplete insofar as their disclosure of the transfer of certain real property to "Whitewater Properties, Inc." and the notation that Whitewater Properties, Inc., was "not related" to the Debtors. The Trustee testified that her investigation revealed the following:

> The corporation [Whitewater] was a corporation that was created and the sole shareholders turned out to be the Debtors' 18 - and 21 - year - old sons. And the property was transferred with the corporation assuming the mortgages only and no cash being paid whatsoever to the Debtors, notwithstanding the fact that in our opinion there was meaningful equity in the properties at the time of the transfers.

[Transcript p. 17:5-12].

6

The Debtors' interest in Whitewater Properties was ultimately purchased by the Debtors when they paid the Chapter 7 Trustee the amount of $70,000.

The record reveals that the Debtor at one time was the sole shareholder in the stock of GSM Properties. The Debtor admitted that he transferred his interest in the stock in GSM Properties to a third party within six (6) months of filing his Petition for Relief pursuant to Chapter 7 of the Bankruptcy Code and this transfer was never disclosed by the Debtor in any of the Debtors' statements.

Based on the foregoing, the Bank contends that it is entitled to a judgment in its favor denying the Debtors' discharge based on Section 727(a)(4)(A) of the Bankruptcy Code.

Before considering the claim asserted in Count I of the Complaint it should be noted that, even prior to the adoption of the Bankruptcy Code, that the provisions dealing with discharge of debtors must generally be construed liberally in favor of the debtor and strictly against those who challenge the debtor's right to a discharge. *Matter of Garman*, 643 F.2d 1252 (7th Cir. 1980); *Kentile Floors, Inc. v. Winham,* 440 F.2d 1128 (9th Cir. 1971). However, it is equally true that the discharge privilege is reserved only to honest debtors. Accordingly, the burden of establishing any of the specific grounds set forth in Section 727(a), which would warrant the denial of the discharge, is on the party challenging the debtor's right to a discharge. Fed.R.Bankr.P. 4005. The burden is no longer by clear and convincing evidence, but a mere preponderance of the evidence is sufficient to prevail and block the debtor's right to a discharge. *Grogan v. Garner*, 498 U.S. 279 (1991).

The claim set forth in Count I alleges a false oath in bankruptcy pursuant to Section 727(a)(4)(A) which provides as follows:

**11 USC § 727. Discharge**

 (a) The court shall grant the debtor a discharge, unless – . . .

   (4) the debtor knowingly and fraudulently, in or in connection with the case –

  (A) made a false oath or account; . . .

Before discussing the facts relevant to this particular claim, the applicable principles governing proceedings that challenge the Debtors' right to a discharge under this section in general should be briefly noted.

One of the grounds to deny the debtor's discharge, which is under consideration at this time, is the claim by the Bank that the Debtors made a false oath in connection with this bankruptcy case. There is no question that Section 727(a)(4) was established to ensure that the trustee and the creditors would receive reliable information in order to assist the trustee in the administration of the estate. *Discenza v. MacDonald (In re MacDonald)*, 50 B.R. 255 (Bankr. D. Mass. 1985). The Statement of Financial Affairs and the Schedules executed by the debtor under oath serve the crucial purpose of ensuring that all relevant and adequate information is available to the Trustee.

In applying the standard and the elements necessary to establish a viable claim under Section 727(a)(4), the Eleventh Circuit, in the case of *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616 (11th Cir. 1984), held that a false oath is made even though the properties omitted are worthless, and that the omission was, in fact, material. In the case of *In re Robinson*, 506 F.2d 1184, 1188 (2d Cir. 1974), the court held that even though truthful responses to the questions propounded by the attorney for the bank would not have increased the value of the estate, they were certainly material and essential for the discovery of what, if any, assets the

debtor may have had. It is clear that the subject of false oaths is always material and bears a relationship to the debtor's business transactions or estate. *In re Steiker*, 380 F.2d 765, 768 (3d Cir. 1967). A debtor may not escape the charge of making a false oath by asserting that the admittedly omitted statement of financial information concerned a worthless business relationship or holding, and thus did not have to be disclosed. Such a defense was held to be specious. *Diorio v. Kreisler-Borg Construction Co. (In re Diorio)* 407 F.2d 1330 (2d Cir. 1969). It makes no difference whether or not the debtor intended to injure his creditors; the creditors are entitled to judge for themselves what will benefit and prejudice them. *Morris Plan Industrial Bank v. Finn*, 149 F.2d 591 (2d Cir. 1945); *Duggins v. Heffron,* 128 F.2d 546, 549 (9th Cir. 1942).

In the present instance the claim of a false oath is based on the undisputed facts that the Debtors' did not schedule various interests in certain real properties. For instance, Mrs. Deerwester testified that she went to the Law Firm with her husband "three times, maybe four" [Transcript p. 37:21-23] and that she reviewed together with her husband the documents they were given by the Law Firm at the initial meeting. [Transcript p. 38:13-21]. Mrs. Deerwester admits having read Plaintiff's Exhibit 2 and signing the last page of Plaintiff's Exhibit 2—the form from the Law Firm that advises the client that, among other things, information she provides "is required to be complete, accurate and truthful", that "all assets and liabilities are to required to be completely and accurately disclosed in the documents filed to commence the case" and that "failure to provide the information may result in dismissal of your case or other sanction…". [Transcript pp. 39:11-14; 41:18-25 and 42:1-11]. She also

testified that no one prevented her from reviewing the Statement of Financial Affairs and the Schedules before she had an opportunity to sign those documents. [Transcript p. 74:11-15].

The Debtors' Schedules failed to disclose two (2) payments made to American Express for "a little over $10,000" within ninety days of filing their Petition. See also Plaintiff's Request for Admission at Question 6 and the Debtors' responses to the Request for Admission at Plaintiff's Exhibit 26 where the Debtors' admit that they paid American Express $10,000 during the 90 days preceding the filing of the Petition. However, in addition to the foregoing, Mrs. Deerwester testified that the payments of $3,000.00 and $7,583.79 were made to American Express in February and March, 2008, respectively, as reflected in Plaintiff's Exhibit 15 and that those payments were not disclosed in response to Question Number 3 on the Debtors Statement of Financial Affairs (Plaintiff's Exhibit No. 9). [Transcript pp. 47:14-25 and 48:1-3;46]. In addition to the foregoing, Mrs. Deerwester testified that the Debtors had owned for ten years the duplexes that were transferred to Whitewater Properties, Inc., a corporation owned by the Debtors' sons who were 18 and 21 at the time of the transfer in 2006 and that the properties were transferred "to help them with their future so that they could start into the real estate and investing and learn how things are done". [Transcript p.50:10-25]. The Whitewater properties were transferred by the Debtors subject to a mortgage in favor of SunTrust with the Debtors receiving no money for transferring the duplexes. [T 52:7-14]. The Whitewater properties are currently managed by GSM. [Transcript p. 55:1-5]. Furthermore, the Debtors made several payments from their personal funds on account of the SunTrust mortgage encumbering the property owned by Whitewater between April, 2007 and March 19, 2008. [Transcript pp. 57-61]. Mrs. Deerwester then explained that (1) she would pay the

SunTrust mortgage from her personal account if "there were vacancies and people paid their rent late" and get reimbursed when the rent came in [Transcript p. 62:1-8] and that (2) "Whitewater would pay their own creditor" and that GSM did not pay the mortgages for its clients such as Whitewater. [Transcript p. 63:15-23]. In cross-examination, however, Mrs. Deerwester testified that Whitewater did not have its own bank account so it had no way to pay a mortgage to SunTrust. [Transcript p. 71:23-25;72:1-3].

Mr. Deerwester testified that, based on the handwritten notations, he and Mrs. Deerwester furnished the information contained in the Miller & Hollander bankruptcy Questionnaire introduced as Plaintiff's Exhibit 4. [Transcript pp. 85:14-25;86,87,89:4). That he transferred majority control of GSM Properties to Floyd Sohn in November, 2007 for which he received $600.00 and that transfer was not disclosed in response to question number 10 on the Statement of Financial Affairs. [Transcript pp. 133:3-5;134,135:1-5; see also Defendants' Answer to paragraph 13 of the Complaint where the fact of the transfer to Mr. Sohn is admitted.] Furthermore, notwithstanding his explanation that GSM Properties "merged" with GSM Real Estate, he confirmed that GSM Properties continued to operate in the property management business until November, 2008 at which time that business was taken over by GSM Real Estate. [Transcript p.126:14-22].

Mr. Deerwester also testified that GSM Properties had no bank loans, no car loans, no equipment leases and no credit cards and that it retains five percent of its collections from tenants as revenue for the company but, in his view, GSM Properties had no assets on the Petition date. [Transcript pp. 95:24-25;97:1-16]. Notably, Schedule I reflects income in the amount of $6,506 per month from "GSM Real Estate", however, Mr. Deerwester confirmed

that, at the time of the Petition, he was employed by GSM Properties.[Transcript p. 126:14-16]. Moreover, the Debtors' personal income tax return, at line 11, (Plaintiff's Exhibit 12) shows "Business Income" of only $33,000 for 2007---an amount far less than is necessary to support the amount shown by the Debtors on Schedule I.

Mr. Deerwester testified that GSM had cash in the bank on the date of the Petition. [Transcript p. 96:14-15]. He also admitted that the tax return for GSM for 2007 (Plaintiff's Exhibit 11) showed cash at the end of the tax year of $26,484.00 and while he tried to explain this away as possibly being "security deposits" owed to clients, he then admitted that security deposits are not "assets". [Transcript pp. 97:21-25;98-99,100:1-20]. Furthermore, Mr. Deerwester asserted that the Debtors had disclosed to Miller & Hollander both an Irrevocable Trust with a value of only "$1.00" and a Revocable Trust with a value in excess of $39,000 on the Petition date but that he didn't know why the Revocable Trust was not disclosed on the Schedules. [Transcript pp. 101,102:1-9]. Ultimately, there was no disclosure in the Schedules or the Statement of Financial Affairs that the Debtors had any interest in the Ameritrade account having a value in excess of $39,000 on the Petition date.

When asked if he read the Schedules and Statement of Financial Affairs before he signed them, Mr. Deerwester testified that he did and while he perhaps didn't do the job he should have done, "we disclosed everything at the first meeting". [Transcript p. 102:10-17]. He further acknowledged that there were "some mistakes" in the Schedules and Statement of Financial Affairs. [Transcript p. 102:24-25]. Mr. Deerwester gave a lengthy explanation as to the reason for the amounts listed in the Schedules as being owed to Frey Motorcars and A&C Medical on account of their secured claims which may basically be summarized as his

understanding that he only had to list the amount of his total credit line with each of these lenders—not the amounts due as of the Petition date. [Transcript pp. 103:15-25; 104-106;107:1-10]. Nonetheless, he later testified that after the first meeting of creditors, he went to these creditors and obtained accurate information as to how much was owed to each of them on the Petition date and that he had not done this before the bankruptcy was filed because "he didn't think it was necessary". [Transcript pp. 120:6-1].

It is without dispute that an occasional omission from schedules will seldom be accepted as a satisfactory basis to establish the claim of a false oath, and some innocent omissions due to oversight may be excused. However, numerous omissions that display a pattern of misleading conduct are sufficient to establish a fraudulent false oath. See *Boroff v. Tully (In re Tully)*, 818 F.2d 106 (1st Cir. 1987).

In the present instance the claim of a false oath is based on the undisputed facts that the Debtors omitted numerous items from their Schedules and Statement of Financial Affairs.

The second ground for the false oath charged is that the debtor knowingly and fraudulently understated the values of their interest in the properties noted above. Ordinarily the statement of value of property is subjective and it is rarely sufficient grounds to sustain the claim for false oath unless the debtor actually knew the true value or the value stated is so outrageously low that any reasonable person would immediately recognize the valuation as baseless and that the value stated was a reckless disregard of the true value. It is without dispute that an occasional omission from schedules will seldom, if ever, be accepted as satisfactory proof of an omission of false oath. However, omissions of several significant assets and disclosures of significant transfers, which reveal a pattern, are willful and knowing

admissions and therefore warrant a denial of discharge. While some innocent omissions due to oversight may be excused, numerous omissions from the Schedule of Assets and Statement of Financial Affairs, which reveal a pattern of unacceptable conduct is sufficient to sustain the claim of false oath. The Statement of Financial Affairs serves an important function for a purpose of insuring that adequate information is available to the Trustee.

Considering the claim set forth in Count II of the Complaint, incorrectly referred by the Bank as a claim filed under Section 727(a)(4)(A), alleges a transfer of property with the intent to hinder, delay or defraud creditors pursuant to Section 727(a)(2)(A).

The claim in Count II is based on Section 727(a)(2)(A) which provides as follows:

**11 USC § 727. Discharge**

(a) The court shall grant the debtor a discharge, unless – . . .

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>
> (A) property of the debtor, within one year before the date of the filing of the petition; . . .

Under this particular Section of the Code, the objecting party has the burden to establish one of the five requirements set forth in the Section. The record is clear that that the claim in Count II, as stated earlier, alleges a fraudulent transfer with intent to hinder, delay or defraud creditors. It is pled that the Debtor, Harry J. Deerwester was 100% owner of GSM Properties in 2007 as reflected by the 2007 tax return filed by GSM Properties. Mr. Deerwester transferred his majority control of GSM to Floyd Sohn towards that later part of 2007 and, therefore, the transfer occurred well within one year before the date of filing the Debtors'

Chapter 7 Petition on March 31, 2008. The record is sufficient to establish that the Debtor was faced with an immediate danger of losing some of his properties and, in fact, it appears that the Debtor was negotiating with the Bank to compromise the judgment, and when the compromise failed. Based on these foregoing facts, the record is sufficient to establish that the transfers were made with the requisite intent to hinder, delay or defraud a creditor.

However, this Court finds that no evidence was presented by the Bank's counsel concerning the relevant transfers of funds from the Debtor, Mrs. Deerwester, to Mr. Sohn. In sum, the evidence as presented in support of this claim as set forth in Count II of the Plaintiff's Complaint is far from being convincing and persuasive and, therefore, this Court is satisfied that the claim in Count II has not been established with the requisite degree of proof with respect to Mrs. Deerwester.

The evidence presented in support of the Bank's claim reveal that Mr. Deerwester failed to disclose the transfer to Floyd Sohn of his interest in GSM. Mr. Deerwester testified that he considered a transfer of "property", as described in Question 10 of the Statement of Financial Affairs, to refer to "real property"—not "stock" although, as referenced in Plaintiff's Exhibit 3, in the Miller & Hollander "Information About Bankruptcy" form, at item 2 (bearing Bates stamp # RJH-00184), the Debtors' were specifically advised to disclose, among other things, "whether they sold any stocks or bonds". Indeed, Mr. Deerwester stated in his trial testimony that while he "thought the attorney would direct [him] better through this," he also confirmed that he read the Miller & Hollander documents introduced as Exhibits 2 and 3, which emphasized the need to make full disclosure and which, in Exhibit 3, even gave examples of the types of matters which needed to be disclosed. [Transcript p. 135:14-25;136;137:1-1-15].

Mr. Deerwester attempted to explain away his lack of knowledge that he was required to disclose his transfer of his interest in GSM Properties in the following exchange:

> Q:[From Mr. Zinn]: So, in your mind, with regard to the merger of the companies, you didn't really think that anything was getting transferred; is that right?
>
> THE COURT: He knew then, after the transaction, he had none.
>
> THE WITNESS: Right. I mean, after the transaction, yes, I would agree with that. But I mean I do know that in order for me to put the two companies together, the stock had to be transferred. The one company was closed. We just kept one, the real estate. So, I mean, the answer would be "yes." I mean, I knew.

This testimony stands in stark contrast to Mr. Deerwester's direct examination testimony that GSM Properties continued to operate until November, 2008 at which time GSM Real Estate took over the property management business --- a full year after Mr. Deerwester transferred sixty (60) percent of his stock in GSM Properties and seven (7) months after the bankruptcy was filed.

This Court is satisfied that the transfer of Mr. Deerwester's interest in GSM Properties was done with the specific intent to at least hinder or delay the Bank in its efforts to enforce and collect on the November 13, 2007, domesticated Lee County, Florida judgment in the amount of $475,000.00.

In accordance with the foregoing, this Court is satisfied that the Bank has established with the requisite degree of proof all operating elements of the claims asserted in Count I and Count II of the Bank's Complaint, vis-á-vis, Mr. Deerwester, pursuant to Sections 727(a)(4)(A) and (a)(2)(A) of the Bankruptcy Code. Therefore, the debt in the amount of

$475,000.00 which was domesticated in Lee County, Florida, on November 13, 2007, is a nondischargeable debt owed to Itasca Bank and Trust by the Debtor, Harry J. Deerwester a/k/a H. Jay Deerwester and the Bank is hereby entitled to the judgment in its favor and against the Debtor, Harry J. Deerwester a/k/a H. Jay Deerwester.

However, this Court finds the evidence as presented in support of this claim as set forth in Count I of the Plaintiff's Complaint is far from being convincing and persuasive and, therefore, this Court is satisfied that the claim in Count I, pursuant to 11 U.S.C. §727(a)(4), has not been established with the requisite degree of proof with respect to Sharon A. Deerwester.

A separate final judgment shall be entered in accordance with the foregoing.

DONE at Tampa, Florida, on _____.

ALEXANDER L. PASKAY
United States Bankruptcy Judge

$475,000.00 which was domesticated in Lee County, Florida, on November 13, 2007, is a nondischargeable debt owed to Itasca Bank and Trust by the Debtor, Harry J. Deerwester a/k/a H. Jay Deerwester and the Bank is hereby entitled to the judgment in its favor and against the Debtor, Harry J. Deerwester a/k/a H. Jay Deerwester.

However, this Court finds the evidence as presented in support of this claim as set forth in Count I of the Plaintiff's Complaint is far from being convincing and persuasive and, therefore, this Court is satisfied that the claim in Count I, pursuant to 11 U.S.C. §727(a)(4), has not been established with the requisite degree of proof with respect to Sharon A. Deerwester.

A separate final judgment shall be entered in accordance with the foregoing.

DONE and ORDERED at Tampa, Florida, on  11-13-09 .

*Alexander L. Paskay*

ALEXANDER L. PASKAY
United States Bankruptcy Judge